Jetty Lee HARVEY, Petitioner,

v.

Duane SHILLINGER, Warden, Wyoming State Penitentiary, and the Attorney General of the State of Wyoming, Respondents.

Nos. 93–CV–105–D, 93–CV–106–D.

United States District Court,
D. Wyoming.

Feb. 1, 1995.

Stuart S. Healy, Sheridan, WY, for plaintiff, Jetty Lee Harvey.

Mary Beth Wolff, Asst. Atty. Gen., Wyoming Atty. General's Office, Cheyenne, WY, for respondents, Duane Shillinger, Warden, Wyoming State Penitentiary, and the Atty. Gen. of Wyoming.

## ORDER GRANTING RESPONDENTS' MOTION TO DISMISS

DOWNES, District Judge.

This matter comes before the Court on Petitioner's Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 and Respondents' subsequent Motion to Dismiss, and the Court, having carefully considered the materials submitted in support of both the petition and motion to dismiss, having heard oral argument of the parties and being otherwise fully advised in the premises, FINDS and ORDERS as follows:

### BACKGROUND

On January 9, 1986, Petitioner Harvey and two other men were charged with kidnapping and sexual assault in the first degree or aiding and abetting in those offenses. Harvey was convicted of those charges following a jury trial held in July of 1987.[1] Following his original conviction, he was sentenced to concurrent prison terms of not less than 20 years nor more than 30 years. At his sentencing hearing on October 23, 1987, Harvey made various statements in allocution under oath. He was represented by retained counsel (Virgil Kinnaird) at this hearing who encouraged Harvey to make a statement of contrition and admission of responsibility. Apparently, neither the presiding judge nor Mr. Kinnaird advised Harvey that his statement in mitigation could be used against him in subsequent criminal proceedings of a related nature.

On appeal, Harvey's first conviction was overturned on speedy trial grounds. *Harvey v. State*, 774 P.2d 87 (Wyo.1989) (*Harvey I*). The prosecuting attorney for Sweetwater County subsequently filed a complaint charging Harvey with conspiracy to commit kidnapping and conspiracy to commit sexual assault. Harvey alleges that the affidavit of probable cause supporting this second complaint was identical to the one supporting the first, except that it included one additional paragraph referring to specific statements made by Harvey at his sentencing hearing following the first trial. Harvey filed written objections and motions in limine regarding use in the second trial of the allocution statements as evidence of his guilt on grounds that such use violated his rights against self-incrimination and his rights to due process. After a hearing, the trial court denied Harvey's motions on the grounds that Harvey was not compelled to make a statement at the sentencing hearing. Rather, the trial

---

1. The procedural background relevant to this decision is generally undisputed. The facts surrounding Petitioner's original arrest and conviction are set forth more specifically in the Wyoming Supreme Court opinions addressing Petitioner's state court appeals. *See Harvey v. State*, 774 P.2d 87 (Wyo.1989); *Harvey v. State*, 835 P.2d 1074 (Wyo.1992).

court found that Harvey's statements in allocution were given freely and voluntarily with a knowledge and understanding of his Fifth Amendment rights. (Jury Trial Transcript, Vol. IV at 994, attached to Mem.Supp.Mot. Dismiss, Ex. C.) Following a jury trial, Harvey was convicted on the charge of conspiracy to commit kidnapping, but was acquitted on the conspiracy to commit sexual assault and received a sentence of 12 to 15 years in the state penitentiary on the kidnapping charge.

The second judgment and sentence was appealed to the Wyoming Supreme Court on four grounds: double jeopardy; speedy trial; violation of right to impartial jury; and violation of due process by use of his allocution statements. *Harvey v. State*, 835 P.2d 1074 (Wyo.1992) (*Harvey II*). Harvey claims that he did not assert ineffective assistance of counsel on appeal because at the time of his trial and during the initial stages of the second appeal, he was represented by a partner of the attorney who represented him in his first trial. On June 11, 1992, the Wyoming Supreme Court affirmed the conspiracy conviction. However, two of the justices dissented on the issue of whether the use of Petitioner's mitigating statement at the sentencing hearing following his first trial to convict him in the second trial constituted a due process violation.

Harvey has petitioned this Court for a Writ of Habeas Corpus asserting five grounds in support thereof: (1) improper use of allocution statements made at sentencing phase of first trial as evidence of guilt in second trial; (2) ineffective assistance of counsel at first sentencing hearing; (3) denial of right to speedy trial; (4) double jeopardy violation; and (5) Wyoming Supreme Court Justice Thomas' participation in the second appeal violated "fundamental fairness" principles.

### DISCUSSION

In discussing the considerations underlying its habeas jurisprudence, the United States Supreme Court noted the principle that collateral review is different from direct review. *Brecht v. Abrahamson*, —— U.S. ——, ——, 113 S.Ct. 1710, 1719, 123 L.Ed.2d 353 (1993). The reason most frequently advanced for distinguishing between direct and collateral review is "the State's interest in the finality of convictions that have survived direct review within the state court system.... In criminal trials, [the States] hold the initial responsibility for vindicating constitutional rights. Federal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." *Id.* at ——, 113 S.Ct. at 1720. "The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited." *Id.* at ——, 113 S.Ct. at 1719.

In keeping with this distinction, the writ of habeas corpus has historically been regarded as an extraordinary remedy, "a bulwark against convictions that violate 'fundamental fairness.'" ... "Those few who are ultimately successful [in obtaining habeas relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation." *Fay v. Noia,* 372 U.S. 391, 440–41, 83 S.Ct. 822, 850, 9 L.Ed.2d 837 (1963).... Accordingly, it hardly bears repeating that "'*an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment.*'" *United States v. Frady,* 456 U.S. 152, 165, 102 S.Ct. 1584, 1593, 71 L.Ed.2d 816 (1982) (quoting *United States v. Addonizio,* 442 U.S. 178, 184, 99 S.Ct. 2235, 2239, 60 L.Ed.2d 805 (1979)).

*Brecht,* —— U.S. at —— – ——, 113 S.Ct. at 1719–20 (citations omitted) (emphasis added).

### Use of allocution statements

Petitioner argues that use of his statement in allocution at the subsequent trial violated his rights against self-incrimination and due process. The Wyoming Supreme Court found that Petitioner's constitutional right against self-incrimination was not violated because the allocution statement was made voluntarily. *Harvey II,* 835 P.2d at 1084. Petitioner argues that the principle of "fundamental fairness" is at stake. In support of this argument, Petitioner quotes Justice Golden's dissenting opinion on the use of his

statement in allocution to convict him in the second trial:

> Our criminal justice system is built on the concept of fairness. We pride ourselves in having informed all participants in advance by what ground rules our system operates; the system abhors surprise and ambush. I can find no fairness in what happened to Mr. Harvey as a result of his allocution statement. I see only surprise and ambush. The sentencing court did not warn him that any thing he said in allocution would be used against him in criminal prosecution; in fact, it was only after Mr. Harvey made his statement that the sentencing judge informed him of his right to appeal the conviction on which, moments before, he had been sentenced. I am unable to find that Mr. Harvey made a knowing, intelligent and informed waiver of his right to remain silent.

*Harvey II,* 835 P.2d at 1135–36. Petitioner further points out that his trial attorney, Mr. Kinnaird, did not advise him that allocution statements could be used against him, or that they could not be used against him. Therefore, Petitioner contends, either the use of Petitioner's statement in allocution constituted a violation of his rights against self-incrimination and due process, or his second conviction was predicated upon ineffective assistance of counsel during the sentencing hearing. According to Petitioner, the Wyoming Supreme Court's finding that his allocution statement was a voluntary waiver of his right against self-incrimination flies in the face of such cases as *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), and *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Petitioner essentially contends that he was impermissibly forced to choose between his right to remain silent and his right to speak on his own behalf for mitigation of punishment.[2]

The *Simmons* Court addressed the dilemma faced by defendants in prosecutions for possessory crimes when the testimony required for standing to assert a Fourth Amendment claim itself proves an element of the offense. "It seems obvious that a defendant who knows that his testimony may be admissible against him at trial will sometimes be deterred from presenting the testimonial proof of standing necessary to assert a Fourth Amendment claim." *Id.* at 392, 88 S.Ct. at 975. The Court stated that the rule adopted by the lower courts imposed upon a defendant a condition which may deter him from asserting a Fourth Amendment objection. "For a defendant who wishes to establish standing must do so at the risk that the words which he utters may later be used to incriminate him." *Id.* at 393, 88 S.Ct. at 976. The Court went on to discuss the holding of other courts which have allowed the admission of such testimony because the testimony was voluntary; hence, no violation of the Fifth Amendment's Self–Incrimination Clause. Those courts reason that testimony is not always involuntary as a matter of law simply because it is given to obtain a benefit. The *Simmons* Court held, however:

> ... the assumption which underlies this reasoning is that the defendant has a choice: he may refuse to testify and give up the benefit. When this assumption is applied to a situation in which the "benefit" to be gained is that afforded by another provision of the Bill of Rights, an undenia-

**2.** Petitioner points out that the right to make a statement in mitigation of fine or punishment has been recognized in Wyoming as constitutionally protected. *See Christy v. State,* 731 P.2d 1204, 1207 (Wyo.1987). Under federal law, the right to allocution is not treated as a constitutional right. *Hill v. United States,* 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962); *and see United States v. Gardner,* 480 F.2d 929 (10th Cir.1973). Rather, it is a right delineated by federal rule of criminal procedure, the violation of which is not subject to collateral attack as unconstitutional. *Hill,* 368 U.S. at 426, 428, 82 S.Ct. at 470, 471; *and see* F.R.Cr.P. 32(a). Under 28 U.S.C. § 2254(a), a writ of habeas corpus disturbing a state-court judgment may issue only if it is found that such prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." Thus, the only injury that will suffice to support a petition for habeas corpus relief is an injury to a federally protected right; state law injuries cannot and do not suffice. *See Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 874–75, 79 L.Ed.2d 29 (1984). This issue is not addressed in detail herein, however, because the Court finds that the fundamental issue is not whether Petitioner's right to allocution was violated, but whether his right against self-incrimination was violated.

ble tension is created. Thus, in this case Garrett was obliged either to give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination. In these circumstances, we find it intolerable that one constitutional right should have to be surrendered in order to assert another.... [W]hen a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection.

*Id.* at 394, 88 S.Ct. at 976.

In a later Supreme Court decision, the defendant was arguing for bifurcation because under the Ohio single trial procedure, he could exercise his constitutional right not to be compelled to be a witness against himself on the issue of guilt only at the cost of surrendering any chance to plead his case on the issue of punishment. *Crampton v. Ohio,* 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971).[3] In support of his position, Crampton argued that the Ohio procedure possessed the flaw the Court condemned in *Simmons.* However, the Supreme Court distinguished the *Simmons* case from Crampton's situation finding that "[t]he only real basis for holding that Fifth Amendment policies were involved [in *Simmons*] was the colorable Fourth Amendment claim with which [the Court] had begun." *Id.* at 212, 91 S.Ct. at 1469.

While we have no occasion to question the soundness of the result in *Simmons* and do not do so, to the extent that its rationale was based on a "tension" between constitutional rights and the policies behind them, the validity of that reasoning must now be regarded as open to question, and it certainly cannot be given the broad thrust

which is attributed to it by Crampton in the present case.

The criminal process, like the rest of the legal system, is replete with situations requiring "the making of difficult judgment" as to which course to follow. *McMann v. Richardson,* 397 U.S. [759], at 769 [90 S.Ct. 1441, 1448, 25 L.Ed.2d 763 (1970)]. [*See, e.g., Brady v. United States,* 397 U.S. 742, 756–57, 90 S.Ct. 1463, 1473–74, 25 L.Ed.2d 747 (1970).][4] Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose. The threshold question is whether compelling the election impairs to an appreciable extent any of the policies behind the rights involved.

*Crampton,* 402 U.S. at 212–13, 91 S.Ct. at 1470.

The *Crampton* Court concluded that it "does no violence to the privilege that a person's choice to testify in his own behalf may open the door to otherwise inadmissible evidence which is damaging to his case." *Id.* at 213, 91 S.Ct. at 1470. The Court further found that the policies of the privilege are remote support for the proposition that defendants should be permitted to limit the effects of their evidence to the issue of punishment. *Id.* at 214, 91 S.Ct. at 1470–71. The Court then noted other situations in which a defendant must make similar choices regarding the waiver of the privilege. For example, a defendant who takes the stand in his own behalf cannot then claim the privilege on cross-examination regarding matters reasonably related to the subject matter of his direct examination. *Id.* at 215, 91 S.Ct. at 1471. The defendant himself determines the area of disclosure and therefore of inquiry. "Such a [defendant] has the choice, after

---

**3.** A petition for rehearing in *Crampton* was subsequently granted and the underlying state-court decision was vacated on Eighth Amendment grounds. 408 U.S. 941, 92 S.Ct. 2873, 33 L.Ed.2d 765 (1972); *see also Jenkins v. Anderson,* 447 U.S. 231, 236–37 n. 3, 100 S.Ct. 2124, 2128 n. 3, 65 L.Ed.2d 86 (1980).

**4.** In noting that the decision to plead guilty is often "heavily influenced by the defendant's appraisal of the prosecution's case against him and

by the apparent likelihood of securing leniency should a guilty plea be offered and accepted," the Supreme Court stated, "Considerations like these frequently present imponderable questions for which there are no certain answers [and] judgments may be made that in the light of later events seem improvident, although they were perfectly sensible at the time." *Brady,* 397 U.S. at 756, 90 S.Ct. at 1473.

weighing the advantage of the privilege against self-incrimination against the advantage of putting forward his version of the facts and his reliability as a witness, not to testify at all." *Brown v. United States,* 356 U.S. 148, 155, 78 S.Ct. 622, 627, 2 L.Ed.2d 589 (1958). "When a witness voluntarily testifies, the privilege against self-incrimination is amply respected without need of accepting testimony freed from the antiseptic test of the adversary process." *Id.* Other noted examples include: a defendant who takes the stand in his own defense may be impeached by proof of prior convictions or the like; and a defendant whose motion for acquittal is denied must decide whether to stand on his motion or put on a defense, with the risk that in so doing he will bolster the Government case enough for it to support a verdict of guilty. *Crampton,* 402 U.S. at 215, 91 S.Ct. at 1471. In this regard, another Supreme Court opinion states that "the Constitution does not forbid 'every government-imposed choice in the criminal process that has the effect of discouraging the exercise of constitutional rights.'" *Jenkins v. Anderson,* 447 U.S. 231, 236, 100 S.Ct. 2124, 2128, 65 L.Ed.2d 86 (1980) (quoting *Chaffin v. Stynchcombe,* 412 U.S. 17, 30, 93 S.Ct. 1977, 1984–85, 36 L.Ed.2d 714 (1973)).[5]

Furthermore, the *Simmons* case is distinguishable from Petitioner's situation because *Simmons* involved a direct conflict between two federal constitutional rights whereas this case involves a choice between the Fifth Amendment right against self-incrimination and the *statutory* right of allocution.[6] In *United States v. De La Paz,* 698 F.2d 695 (5th Cir.1983), the defendant had requested the trial court for a postponement of his

sentencing hearing on the grounds that he could not adequately exercise his right of allocution because an indictment for a "continuing criminal enterprise" was pending against him, and the information he wished to offer to mitigate his sentence for the crime might be used against him in the pending trial. The trial judge responded by saying that he would not consider anything for which he had not been convicted and would order that any statements made in allocution not be used against him, but he refused to postpone sentencing. Nevertheless, the defendant chose to say nothing in mitigation. On appeal, De La Paz maintained that the court's refusal to grant a postponement forced him to give up his right of allocution in order to assert his right to remain silent which deprived him of due process. The Fifth Circuit Court of Appeals noted that the defendant had cited no cases holding that a defendant's opportunity to speak on his own behalf must be completely unimpeded. *Id.* at 697. The court held that "although a defendant has a statutory right of allocution, the right does not require the protections afforded fundamental constitutional rights, such as the fifth amendment right against self-incrimination." *Id.; See also United States v. Fleming,* 849 F.2d 568, 569 (11th Cir.1988) (No authority to support claim that the court must either refuse to consider evidence of acts for which defendant has not been charged or convicted or grant immunity from prosecution for any statements made in allocution).

Respondents admit that the general rule regarding the admissibility of a defendant's testimony at a former trial as evidence

**5.** *Jenkins v. Anderson* involved a conflict between the defendant's Fifth Amendment right to remain silent and his right to testify in his own defense. At the trial the prosecutor attempted, on cross-examination, to impeach Jenkins' credibility by commenting on his prearrest silence. In seeking habeas corpus relief, Jenkins contended that the prosecutor's comments violated the Fifth Amendment. 447 U.S. at 235, 100 S.Ct. at 2127–28. The Supreme Court held that the "Fifth Amendment is not violated by the use of prearrest silence to impeach a criminal defendant's credibility." *Id.* at 238, 100 S.Ct. at 2129. The Court concluded that while the Fifth Amendment prevents the prosecution from commenting on the silence of a defendant who has asserted the right

to remain silent during his criminal trial, the Fifth Amendment is not violated when a defendant who voluntarily takes the stand in his own defense is impeached with his prior silence. "[I]mpeachment follows the defendant's own decision to cast aside his cloak of silence and advances the truth-finding function of the criminal trial." *Id.* The Court further held that the use of prearrest silence to impeach a defendant's credibility does not deny that defendant the fundamental fairness guaranteed by the Fourteenth Amendment. *Id.* at 238–39, 100 S.Ct. at 2129–30.

**6.** *See* n. 2, *supra.*

against him in later proceedings is governed by the voluntary nature of the waiver of the right against self-incrimination. In *Harrison v. United States*, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968), the Supreme Court stated:

> [W]e need not and do not question the general evidentiary rule that a defendant's testimony at a former trial is admissible in evidence against him in later proceedings. A defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives, and that waiver is no less effective or complete because the defendant may have been motivated to take the witness stand in the first place only by reason of the strength of the lawful evidence adduced against him.[7]

*Id.* at 222, 88 S.Ct. at 2010.[8]

The D.C. Circuit Court of Appeals has likewise recognized that the Fifth Amendment standards of voluntariness are required when a confession at allocution is involved, at least when the defendant has testified at trial and denied the crime. *Scott v. United States*, 419 F.2d 264, 268 (D.C.Cir.1969). That court appears to have found that the voluntariness requirement was not met because the trial judge had placed pressure on the defendant to confess his guilt at the sentencing hearing in order to get any leniency on the sentence. *Id.*

■■■ Based on the foregoing analysis, this Court finds that the use of a defendant's allocution statements in subsequent proceedings does not violate that defendant's due process rights if the making of such statements was an effective waiver of his Fifth Amendment rights. "The question of an effective waiver of a federal constitutional right in a proceeding is of course governed by federal standards." *Boykin v. Alabama*, 395 U.S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274 (1969). The question of waiver is not a question of historical fact, but one which requires application of federal constitutional principles to the facts as found. *Brewer v. Williams*, 430 U.S. 387, 403, 97 S.Ct. 1232, 1241–42, 51 L.Ed.2d 424 (1977).

■■■ In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court recognized that an individual may voluntarily, knowingly and intelligently waive his Fifth Amendment rights and agree to make a statement. For this purpose, the *Miranda* Court expressly adopted the "high standard of proof for the waiver of constitutional rights" set forth in *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938): " '[C]ourts indulge every reasonable presumption against waiver' of fundamental constitutional rights and ... we 'do not presume acquiescence in the loss of fundamental rights.' " *Id.* at 464, 58 S.Ct. at 1023. Waiver is an intentional relinquishment or abandonment of a known right or privilege, and whether such a relinquishment or abandonment has occurred depends in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused. *Id.* "[The United States Supreme Court has] applied the *Zerbst* approach in many contexts where a State bears the burden of showing a waiver of constitutional

---

7. The defendant's conviction was ultimately reversed in that case, however, because the Supreme Court found that the evidence introduced against him by the United States consisted of confessions which were illegally obtained. *Harrison*, 392 U.S. at 226, 88 S.Ct. at 2012.

8. The Wyoming Supreme Court likewise held that unless a defendant's statements in allocution are compelled, subsequent use of such statements against the defendant is not a violation of Fifth Amendment rights.

> A defendant's choice to exercise his right to allocution is entirely voluntary; he can speak to the court, but he is not required to do so. We do not prescribe limits on what the defendant can or cannot say during allocution. A defendant's statements may be admissible against him in further proceedings, provided they are voluntary. However, if the trial court were to require a defendant to confess to criminal activities in his allocution in return for a more lenient sentence, those statements would amount to "genuine compulsion of testimony" in violation of the right against self-incrimination.

> *Harvey II*, 835 P.2d at 1082–83 (citing *United States v. Washington*, 431 U.S. 181, 187, 97 S.Ct. 1814, 1818–19, 52 L.Ed.2d 238 (1977) (Fifth Amendment proscribes only self-incrimination obtained by a "genuine compulsion of testimony")).

criminal procedural rights.... Notwithstanding [its] acknowledgement that *Miranda* rights are 'not themselves rights protected by the Constitution but ... instead measures to insure that the right against compulsory self-incrimination [is] protected,' (citation omitted) [the Court has] adhered to the principle that nothing less than the *Zerbst* standard for the waiver of constitutional rights applies to the waiver of *Miranda* rights." *Minnick v. Mississippi,* 498 U.S. 146, 159, 111 S.Ct. 486, 494, 112 L.Ed.2d 489 (1990) (Scalia, J., dissenting).

In *Colorado v. Spring,* 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987), the Supreme Court noted that the inquiry whether a waiver is coerced "has two distinct dimensions:"

> First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. (citation omitted)

*Id.* at 573, 107 S.Ct. at 857 (quoting *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1140–41, 89 L.Ed.2d 410 (1986)). The Court then held that

> [t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege.... The Fifth

Amendment's guarantee is both simpler and more fundamental: A defendant may not be compelled to be a witness against himself in any respect.... The *Miranda* warnings ensure that a waiver of these rights is knowing and intelligent by requiring that the suspect be fully advised of this constitutional privilege, including the critical advice that whatever he chooses to say may be used as evidence against him.

479 U.S. at 574, 107 S.Ct. at 857.

 While this Court recognizes that the *Miranda* line of cases discussed above have a limited application to the case at bar as those cases dealt with custodial interrogations, such cases are instructive here in that they set forth what constitutes an effective waiver of the Fifth Amendment right to remain silent. "The purpose of [the *Miranda*] admonitions is to combat what the Court saw as 'inherently compelling pressures' at work on the person and to provide him with an awareness of the Fifth Amendment privilege and the consequences of forgoing it, which is the prerequisite for 'an intelligent decision as to its exercise.'" *Estelle v. Smith,* 451 U.S. at 467, 101 S.Ct. at 1875. Therefore, an effective waiver of one's Fifth Amendment right against self-incrimination may only be accomplished if voluntary, knowing, and intelligent with an understanding of the consequences of such waiver. Had the State "compelled," or even impermissibly influenced, Petitioner to testify at the original sentencing hearing, his argument that the subsequent use of his allocution statements violated his right against self-incrimination might have merit under the rationale of *Estelle v. Smith, supra.*[9] There is no evidence

---

9. In *Estelle v. Smith,* the defendant had been in custody at the county jail when a pretrial psychiatric examination, ordered by the trial court, was conducted to determine the defendant's competency to stand trial. The doctor who had performed the examination subsequently testified for the prosecution at the penalty phase on the crucial issue of the defendant's future dangerousness. The Supreme Court found that, at that point, "[the doctor's] role changed and became essentially like that of an agent of the State recounting unwarned statements made in a post-arrest custodial setting." 451 U.S. at 467, 101 S.Ct. at 1875. The Court held that the considerations requiring the giving of *Miranda* warnings

prior to custodial interrogation applied with equal force to the pretrial psychiatric examination. *Id.* Because the defendant had not voluntarily consented to the examination after being informed of his right to remain silent and the possible use of his statements, the Court found that the State could not use such statements to establish his future dangerousness. *Id.* at 468, 101 S.Ct. at 1875–76. The Supreme Court ultimately concluded that, "when faced while in custody with a court-ordered psychiatric inquiry, [defendant's] statements to [the doctor] were not 'given freely and voluntarily without any compelling influences' and, as such, could be used as the State did at the penalty phase only if [defen-

in the record that the allocution statements made by Petitioner were compelled or coerced. Rather, Petitioner made a voluntary plea in mitigation at his sentencing hearing and he did so on the advice of counsel in hopes of obtaining leniency on his sentence. As discussed above, being required to choose between the exercise of competing rights, even if such rights are of constitutional dimensions, does not necessarily make such a choice involuntary.

■ The more difficult question for the Court is whether the Petitioner could have made a "knowing" and "intelligent" waiver of his Fifth Amendment rights if he was ignorant of the specific consequence that a statement in mitigation could be used against him in a subsequent prosecution for conspiracy charges. As has been recognized by this Court, as well as essentially conceded by the parties, the situation which occurred in this case was not considered by Petitioner's attorney at the time or by the trial court, nor is such a situation generally contemplated by trial courts when conducting sentencing procedures in general.[10] For this reason, the trial court did not advise Petitioner that such a statement could be used against him in subsequent proceedings. Nonetheless, Petitioner was advised of his Fifth Amendment rights at the time he was arrested, at the time of his initial appearance in county court, and at the time of his arraignment in district court, and was represented by counsel at all relevant times. The issue then becomes whether the Petitioner can be charged with understanding the basic privilege guaranteed by the Fifth Amendment throughout subsequent proceedings.[11] Although Petitioner was not aware of the specific consequences that resulted from a waiver of his right to remain silent at the sentencing hearing, "[t]he Constitution does not require that a

criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring, supra.* Considering the totality of circumstances surrounding the proceedings in state court, including the fact that in the first trial Petitioner made decisions about whether to testify or not to testify on his own behalf, the Court finds that Petitioner voluntarily, knowingly, and intelligently waived his right against self-incrimination at his first sentencing hearing.

*Ineffective assistance of counsel*

■ The law regarding ineffective assistance of counsel claims is well-established. In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court set forth a two-part test for analyzing claims of ineffective assistance of trial counsel. The defendant has the burden of demonstrating that his attorney's performance was so deficient in light of "prevailing professional norms" that he failed to meet the minimal standard of "counsel" and the "wide range of professionally competent assistance" required by the Sixth Amendment. *Id.* at 687–90, 104 S.Ct. at 2065. In order to make this showing, the defendant must overcome the "strong presumption" that counsel's performance was effective. *Id.* at 689, 104 S.Ct. at 2065; *see also United States v. Haddock,* 12 F.3d 950, 955 (10th Cir.1993). If the defendant can show a deficient act or omission of counsel, then he bears the burden of proving that those errors were so serious and prejudicial that they deprived the defendant of a fair trial. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064; *see also United States v. Voigt,* 877 F.2d 1465, 1467–68 (10th Cir.), *cert. denied,* 493 U.S. 982, 110 S.Ct. 517, 107 L.Ed.2d 518 (1989); *United States v. Rantz,* 862 F.2d 808, 810–11 (10th Cir.1988), *cert.*

dant] had been apprised of his rights and had knowingly decided to waive them." *Id.* at 469, 101 S.Ct. at 1876.

**10.** It appears that this precise issue, whether the use of a defendant's allocution statement in a subsequent prosecution, when defendant was not advised at the sentencing hearing that any such statement could be used against him in subsequent proceedings, violates that defendant's Fifth Amendment rights, is an issue of first impression.

After an exhaustive search, neither the Court nor the parties were able to locate any case law in this regard. Thus, the Court relies primarily on the *Miranda* line of cases.

**11.** Again, neither the Court nor the parties were able to locate any federal case law addressing the issue of whether *Miranda* type warnings need to be given at each stage of the criminal proceedings, including allocution.

*denied,* 489 U.S. 1089, 109 S.Ct. 1554, 103 L.Ed.2d 857 (1989). The prejudice component of this test requires the defendant to demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. The core of the *Strickland* standard is whether counsel's actions were objectively reasonable under the circumstances. *See Strickland,* 466 U.S. at 687–88, 104 S.Ct. at 2064–65.

Petitioner argues that the first component is met because Mr. Kinnaird did not make a strategic or tactical choice between the options of having Petitioner confess to his wrongdoing in his first trial and the possible consequences of that statement in a second trial; rather, he negligently encouraged the Petitioner to testify concerning his involvement in the incident. Petitioner also states that the charging instruments supporting the second prosecution and conviction, the statements of the government prosecutor in chambers and to the jury, and the verdict itself provide the necessary showing for the second component.

■ Respondent first argues that Petitioner is barred from presenting this issue because he failed to raise this issue in his direct appeal to the Wyoming Supreme Court. Respondents cite to case law which holds that in order to raise the issue in a federal habeas corpus action he must demonstrate cause for failure to raise the issue on appeal, and actual prejudice resulting from the alleged constitutional violation. *See Reed v. Ross,* 468 U.S. 1, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984); *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). Petitioner admits that he did not assert a violation of his rights to effective assistance of counsel. His reason is that at the time of his trial, and during the initial stages of the second appeal, the Petitioner was represented by a partner of the attorney who represented Petitioner in his first trial and during the sentencing hearing following that trial. This fact alone is not sufficient cause for failure to raise this issue on direct appeal, especially since it appears that Petitioner's counsel was retained.

■ Regardless of such a failure, however, the Wyoming Supreme Court specifically noted that the issue of whether Petitioner's allocution statement could be used against him in a subsequent prosecution was one of first impression in Wyoming. Respondents argue, therefore, that if the issue was one of first impression, then the failure of trial counsel to advise Petitioner that his statement could be used against him in a subsequent prosecution cannot amount to ineffective assistance of counsel under the *Strickland* standard. The following passage from *Strickland* gives guidance on this point:

[A] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.

The *Strickland* case further states, "Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment." Applying this standard, Petitioner has not demonstrated that Mr. Kinnaird's actions amounted to ineffective assistance of counsel as guaranteed by the Sixth Amendment. Instead, the Court finds that Mr. Kinnaird's actions were objectively reasonable under the circumstances and that Petitioner has offered no evidence to rebut the presumption that trial counsel was functioning within the wide range of reasonable professional assistance.

### Double Jeopardy

■ The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb." Petitioner argues that his right to be free from being tried and convicted on successive prosecutions for the same offense was violated be-

cause his second prosecution and conviction were premised upon the same factual circumstances. In support of his argument, Petitioner cites to *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990) wherein the Supreme Court said that the Double Jeopardy Clause bars a prosecution where the Government, "to establish an essential element of an offense charged in that prosecution, will prove conduct that constitutes an offense for which the defendant has already been prosecuted." *Id.* at 521, 110 S.Ct. at 2093. However in a later case, the Supreme Court addressed the statement in the *Grady* opinion:

Taken out of context, and read literally, this language supports the defense of double jeopardy. But we decline to read the language so expansively, because of the context in which *Grady* arose and because of difficulties which have already arisen in its interpretation.

*United States v. Felix*, 503 U.S. 378, 388, 112 S.Ct. 1377, 1383–84, 118 L.Ed.2d 25 (1992). After discussing the context in which *Grady* arose, the Supreme Court noted the "rule that a substantive crime, and a conspiracy to commit that crime, are not the 'same offense' for double jeopardy purposes." *Id.* at 389, 112 S.Ct. at 1384. As an example the Court discussed its holding in *United States v. Bayer*, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947):

In language applicable here, we pointedly stated that "the same overt acts charged in a conspiracy count may also be charged and proved as substantive offenses, for the agreement to do the act is distinct from the act itself." [331 U.S. at 542, 67 S.Ct. at 1399]; see also *Pinkerton v. United States*, 328 U.S. 640, 643, 66 S.Ct. 1180, 1182, 90 L.Ed. 1489 (1946) ("[T]he commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses ... [a]nd the plea of double jeopardy is no defense to a conviction for both offenses"). We have continued to recognize this principle over the years. See *Iannelli v. United States*, 420 U.S. 770, 777–779, 95 S.Ct. 1284, 1289–1291, 43 L.Ed.2d 616 (1975); *Garrett v. United States*, 471 U.S. 773, 778, 105 S.Ct. 2407, 2411, 85 L.Ed.2d 764 (1985) ("[C]onspiracy is a distinct offense from the completed object of the conspiracy")....

*Felix*, 503 U.S. at 390, 112 S.Ct. at 1384–85. Ultimately, the *Felix* Court held that "prosecution of a defendant for conspiracy, where certain of the overt acts relied upon by the Government are based on substantive offenses for which the defendant has been previously convicted, does not violate the Double Jeopardy Clause." *Id.* at 380–81, 112 S.Ct. at 1380. In light of the foregoing, the Court finds that the prosecution of Petitioner on conspiracy charges after his conviction for the substantive offenses, does not violate double jeopardy principles.

*Speedy Trial*

 Petitioner alleges that he was denied a speedy trial and deprived of due process of law by the passage of 1,460 days from his original arrest on the substantive offense (January 5, 1986) until his second trial on the conspiracy charges (January 8, 1990). However, the speedy trial calculation begins upon arrest or "when a formal criminal charge is instituted and a criminal prosecution begins." *United States v. MacDonald*, 456 U.S. 1, 6, 102 S.Ct. 1497, 1501, 71 L.Ed.2d 696 (1982). Because the substantive crime and conspiracy to commit that crime are separate offenses, speedy trial rights did not attach to the conspiracy charges until the date the complaint on such charges was filed. Thus, the relevant time period is from the filing of the first complaint relating to the conspiracy charges, July 7, 1989, until the date of the trial, January 8, 1990. *Harvey II*, 835 P.2d at 1078.

"[A]ny inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case." *Barker v. Wingo*, 407 U.S. 514, 522, 92 S.Ct. 2182, 2188, 33 L.Ed.2d 101 (1972). "[U]nlike the right to counsel or the right to be free from compelled self-incrimination, deprivation of the right to speedy trial does not *per se* prejudice the accused's ability to defend himself." *Id.* at 521, 92 S.Ct. at 2187. In *Barker v. Wingo*, the Supreme Court identified four factors to be considered in determining whether a particular defendant has been deprived of his right to a speedy trial: length

of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. *Id.* at 530, 92 S.Ct. at 2191–92; *and see United States v. Dirden,* 38 F.3d 1131 (10th Cir.1994). In applying these factors to the relevant time period in Petitioner's case, it is clear that Petitioner's right to a speedy trial on the conspiracy charges was not violated.[12]

*Participation by Justice Thomas in Second Appeal*

 In his Memorandum in Opposition to Respondents' Motion to Dismiss filed in Case No. 93–CV–106–B (consolidated with the 93–CV–105–J which addressed the issues above), Petitioner refers to several statements made by Wyoming Supreme Court Justice Richard Thomas regarding his dissenting opinion in *Harvey I* and his opinions on choices the judiciary must make.[13] (Mem.Opp'n Resp't Mot. Dismiss at 2–3.) Petitioner asserts that Harvey was deprived of due process of law by Justice Thomas' participation in his second appeal because of the justice's biases regarding the case. In support of this assertion, Petitioner cites to the Fifth and Fourteenth Amendments to the United States Constitution, the Wyoming Constitution and Statutes relating to the right to appeal from a criminal conviction, and to Canon 3 of the Wyoming Code of Judicial Conduct: A judge shall perform the duties of judicial office impartially and diligently. Petitioner then states, "The above constitutional provisions, state statutes, and Code of Judicial Conduct are all intended to provide a defendant with a fair an impartial trial, free and clear of actual bias or 'such likelihood of bias or an appearance of bias that the judge (is) unable to hold the balance between vindicating the interests of the court and the interests of the accused.'" (Mem.Opp'n Resp't Mot. Dismiss at 6 (citing *Taylor v. Hayes,* 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974)).)

 After taking Justice Thomas' deposition, Petitioner filed a Supplemental Brief in which he quotes the following language from an early Supreme Court case: "... but we may say that its solitude is that the tribunals of the country shall not only be impartial in the controversies submitted to them, but shall give assurances that they are impartial,—free, to use the words of the section, from any 'bias or prejudice' that may disturb the normal course of impartial judgment...." *Berger v. United States,* 255 U.S. 22, 31, 41 S.Ct. 230, 232, 65 L.Ed. 481 (1921). In essence, Petitioner is asserting that Justice Thomas was improperly influenced by the infusion of public criticism surrounding the outcome of *Harvey I.* Thus, Petitioner argues, Justice Thomas' refusal to recuse himself from deliberations in the second appeal violated the concept of fundamental fairness. In response to Petitioner's Motion for Disqualification requesting Justice Thomas' recusal, Justice Thomas stated: "Because the Motion for Disqualification was addressed to me personally as well as the court, I have reviewed the Motion for Disqualification and the opinions of the court in the earlier case quite carefully. I have also deliberated with respect to any personal bias I might hold against Mr. Harvey, and I have concluded that there is none. I plan to exercise the functions of my judicial office in this case as I would in any other case." (Letter to Stuart Healy, counsel for Petitioner, dated August 2, 1990 attached to Pet. Writ Habeas Corpus, No. 93–CV–106.)

---

12. The Wyoming Supreme Court applied these same four factors set forth in *Barker v. Wingo* to its determination of whether the Petitioner was denied his right to a speedy trial. *Harvey II,* 835 P.2d at 1078–79. The *Harvey II* opinion also outlines the dates and delays relevant to this Court's analysis of the speedy trial issue. *Id.*

13. Petitioner specifically refers to the following statements made in Justice Thomas' dissent in *Harvey I:* "I doubt that a cloud of suspicion is very troublesome to the guilty, and we don't have any question that Harvey is guilty," *Harvey I,* 774 P.2d 87, 114 (Wyo.1989) (Thomas, J., dissenting);

"My judgment and my reason lead me to conclude that society should assure Harvey his just desserts for his criminal conduct." *Id.* at 116. However, the justice also stated: "I have no difficulty in supporting the constitutional principle. I even have no difficulty extending it to any criminal case. The difficulty that I have is with invoking the right to a speedy trial when it is not necessary to prevent actual prejudice, but its application, instead, is premised only upon an assumption of prejudice. In this instance, no one is able to suggest that Harvey suffered actual prejudice in defending the case." *Id.* at 114.

The Court finds that federal law is instructive in evaluating the merits of this claim. In the federal system,[14] "the judge's actual state of mind, purity of heart, incorruptibility, or lack of partiality are not the issue." *United States v. Cooley,* 1 F.3d 985, 993 (10th Cir. 1993). The test in the Tenth Circuit is "whether a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality." *Id.* (quoting *United States v. Burger,* 964 F.2d 1065, 1070 (10th Cir.1992) (quoting *Hinman v. Rogers,* 831 F.2d 937, 939 (10th Cir.1987)). "The standard is purely objective. The inquiry is limited to outward manifestations and reasonable inferences drawn therefrom. In applying the test, the initial inquiry is whether a reasonable *factual* basis exists for calling the judge's impartiality into question." *Cooley,* 1 F.3d at 993 (emphasis in original). Although the statements made by Justice Thomas, taken by themselves, may arguably raise some suspicion regarding his impartiality in Petitioner's criminal proceedings, this Court finds that in considering the totality of circumstances surrounding such statements, and in light of the justice's careful consideration of and response to Petitioner's Motion for Disqualification, a reasonable person would not harbor doubts about Justice Thomas' impartiality. Rather, it is clear that Justice Thomas' dissent in *Harvey I* is based upon a careful and thoughtful consideration of the applicable facts and law and not on any personal biases toward the defendant. Further, this Court is not inclined to infringe upon a justice's right to comment on his opinions about a particular case, or his opinions about the role of courts in general. The Court finds that Justice Thomas' participation in the second appeal did not violate Petitioner's rights to due process of law.

For all the reasons set forth herein, the Court concludes that the petition for a writ of habeas corpus must be denied and that the Respondents' motion to dismiss is warranted.

THEREFORE, it is

ORDERED that Respondents' Motion to Dismiss is GRANTED and that the Petition for Writ of Habeas Corpus is DISMISSED.

---

**14.** Title 28 U.S.C. § 455(a) provides: "Any justice, judge, or magistrate of the United States shall disqualify himself in any proceedings in which his impartiality might reasonably be questioned."